Edward L. BAKEWELL, Jr., et al., Plaintiffs–Respondents,

v.

HERITAGE NATIONAL BANK, Defendant–Appellant,

and

Joseph J. Kelley, Jr., et al., Defendants–Respondents.

No. 64410.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 13, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 25, 1995.

654

Stanley E. Goldstein, Clayton, for appellant.

Alan G. Gerson, Blumenfeld, Kaplan & Sandweiss, P.C., St. Louis, Mark E. Goodman, Clayton, Cathy Steele, St. Louis, Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., for respondents.

Deborah Davis, pro se.

CRANDALL, Judge.

Defendant, Heritage National Bank (Bank), appeals from the judgment of the trial court, in a court-tried case, entered in favor of plaintiffs, Edward L. Bakewell, Jr., et al., on plaintiffs' claim for Bank's breach of an escrow agreement and entered against Bank on its counterclaim against plaintiffs and on its cross-claim against the other defendants, Joseph J. Kelley, et al. We affirm.

 Appellate review of a court-tried case is guided by the principles enunciated in the oft-cited *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). We will uphold the judgment of the trial court unless it is not supported by substantial evidence, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* at 32. The power to set aside a decree or judgment on the ground that it is against the weight of the evidence is to be exercised with caution and with a firm belief that the decree or judgment is wrong. *Id.*

The evidence established that in 1988, Fortune 6B Company (Fortune) was a general partnership comprised of five individuals and a corporation including Edward L. Bakewell, Jr.; Manchester/270 Partnership (Manchester) was a general partnership comprised of individuals, with Joseph J. Kelley, Jr. as the managing partner; and P.I.C., Inc. (PIC) was a corporation whose principal was Michael Ratteree. Fortune, Manchester, and PIC were the owners of three separate pieces of commercially zoned real estate in the vicinity of Manchester Road and Interstate Highway 270 in St. Louis County, Missouri. In furtherance of their plans to con-

struct commercial buildings on their respective properties, Fortune, Manchester, and PIC determined to share expenses for the extension of a water main to their properties (project). The St. Louis County Water Company (Water Company) required that funds for the project be deposited into an escrow account.

On July 15, 1988, Manchester, Fortune, and PIC entered into an agreement, styled "Clayton–Manchester Water Main Contributors Agreement" (Agreement). The Agreement estimated the total cost of the project at $690,169.00 and set up a schedule of installment payments. It provided that PIC, Fortune, and Manchester, collectively referred to as "Contributors" in the Agreement, each pay a percentage of the total cost of the project, the amount determined by the square footage of the respective properties, as follows: Manchester at 39.07 percent; PIC at 39.45 percent; and Fortune at 21.48 percent. There were five installment payments: on July 15, 1988; on October 15, 1988; on January 15, 1989; on April 15, 1989; and on July 15, 1989. Paragraph 3 of the Agreement defined default by a Contributor and provided a mechanism to cover the amount unpaid:

(a) If any Contributor fails to make the required contribution within ten (10) days after written demand therefor from the Escrow Agent, then the amount of such unpaid contribution shall constitute a debt of the defaulting Contributor. . . .

(b) The non-defaulting Contributors will . . . make contributions among themselves . . . equal to the unpaid portion of the defaulting Contributor's proportionate share of the deficit. . . .

Paragraph 3(b) also contained a formula for calculating the portion owed by each non-defaulting Contributor to cover the amount in default. The Agreement established an escrow account and designated Bank as the escrow agent. Paragraph 4 of the Agreement delineated Bank's duties:

4. The Escrow Agent is authorized to receive and distribute funds to the Water Company and to the Contributors in accordance with the provisions of this Agreement. Any interest earned on the es-

crowed funds or any excess funds remaining after construction of the [project] shall be applied in the following order of priorities:

(a) First to the payment of the Escrow Agent's fees and expenses (including reasonable attorneys fees);

(b) Any balance pro rata among the non-defaulting Contributors in proportion to their percentage interests. . . .

Paragraph 4 also contained an indemnification clause: "The Contributors shall indemnify and save harmless the Escrow Agent from any loss, damage or liability arising from the Escrow Agent's performance of its duties within the scope of its authority, except for acts of actual fraud, gross negligence or willful misconduct." Paragraph 5 of the Agreement authorized Bank "to receive any refunds paid by the Water Company . . . and any refunds shall be divided among the Contributors according to their percentage interests. . . ."

The Agreement further authorized Kelley to act on behalf of PIC, Fortune, and Manchester to implement the project. Kelley, who was a shareholder and director of Bank, was instrumental in naming Bank as the escrow agent. Throughout the project, Kelley was the person who assumed responsibility for collecting the payments from the Contributors and for making distributions from the escrow account to the Water Company. Thus, Kelley was the sole contact with the Water Company and with Bank.

On July 15, 1988, Fortune and Manchester paid their first installments to Kelley. PIC's payment, however, was for a lesser amount than the scheduled payment and Manchester made up the difference. Although construction on Manchester's office building was progressing on schedule, construction on PIC's and Fortune's buildings was stalled. When the second payment was due, PIC learned that some property attributed to it actually belonged to Heatherton Enterprises, Inc. (Heatherton). PIC, along with Fortune and Manchester, made the second payment when it came due. In conjunction with the second payment, PIC executed the "First Amendment to Contributors Agreement" (First Amendment) with Fortune, Bank, Manches-

ter, and Heatherton. The First Amendment stated that PIC's obligations under the original Agreement were satisfied and released PIC from any further obligations under the Agreement. The First Amendment substituted Heatherton in place of PIC as a Contributor under the Agreement.

The third installment was due on January 15, 1989. Manchester and Fortune made their scheduled contributions, but Heatherton did not. Manchester, through Kelley, requested that Heatherton make its payment. When it refused, Manchester then called upon Fortune to contribute its pro-rata share of the delinquent funds. Fortune suggested that they explore other avenues for collecting the funds from Heatherton. Manchester, however, paid the full amount of Heatherton's contribution.

Kelley informed Bank that Heatherton and Fortune were in default as a result of their refusal to pay in conformity with the Agreement. Kelley sent a written notice of default to Fortune on behalf of Bank, signing his name as a Bank director. Fortune continued to negotiate with Manchester to resolve the issue of the Heatherton default.

When the fourth and fifth installments came due in April 1989 and July 1989, respectively, Fortune and Manchester again paid; Heatherton did not. Each time, Manchester made the payment to cover the shortage occasioned by the Heatherton default and Fortune refused to contribute its share. During this period of time, Fortune also informed Manchester that it was aware that Kelley, through Kelley Properties, Inc. (Properties), had an option to purchase an additional 18 acres immediately to the north of Manchester's property and that Kelley was seeking commercial zoning for that tract of land. Fortune contended that Kelley had concealed the additional land when the original Agreement was negotiated. Fortune wanted the square footage potentially available to Properties to be considered in computing its share of the Heatherton default.

On September 8, 1989, Manchester and Fortune entered into a third agreement (Adjustment Agreement) whereby they acknowledged that Heatherton was in default in the amount of $179,495.20. The Adjustment Agreement recognized that the tract of land on option to Properties would "directly benefit from the construction of the pipeline under the Water Main Agreement ..." and sought "to adjust and set forth their respective obligations under the Contributors Agreement in the event that the Additional Tract does so benefit...." The terms of the Adjustment Agreement required Fortune to pay its share of the Heatherton deficit, plus interest, on or before June 1994. Fortune's payments depended on the type of rezoning, if any, obtained by Properties, Kelley, or any entity controlled by Kelley. Bank was not aware of the Adjustment Agreement between Manchester and Fortune.

In January 1990, Water Company sent a check in the amount of $266,979.41 to Kelley, payable to "CLAYTON–MANCHESTER WATER MAIN CONTRIBUTORS, A GEN'L PTNSHP." The check represented excess funds remaining after completion of the project. Kelley deposited the check into the escrow account at Bank. Manchester, by and through Kelley, directed Bank to make the following disbursements: a cashier's check of $115,819.61 payable to Manchester; a transfer of $93,812.62 into Manchester's account; and a cashier's check of $61,199.24 payable to Properties. Fortune was not notified either about the receipt of the refund check from the Water Company or about the distribution of the funds from the escrow account.

In Spring 1990, Fortune learned about the refund. Kelley refused to pay Fortune any of the refund money. In June 1990, Fortune made demand upon Kelley, Manchester, and Bank for its pro-rata share, or 21.48 percent, of the refund, for a total of $57,587.03. At that time, only $1,000.00 remained in the escrow account. Manchester informed Fortune that because Fortune was in default under the Agreement, it was not entitled to any portion of the refund.

Fortune then brought the present action against Bank, Kelley, Manchester, and Properties. In Counts I and II, Fortune sought actual and punitive damages against Kelley and Manchester, respectively, for breach of fiduciary duty. In Count III, Fortune

sought damages from Bank, Kelley, and Properties for money had and received from the escrow account. In Count IV, Fortune sought damages against Bank, Kelley, and Manchester for breach of contract for their actions in the receipt and distribution of the refund money. Bank counterclaimed against Fortune and cross-claimed against Manchester, Properties, and Kelley, seeking indemnification in accordance with the Agreement.

After a court-tried case, the trial court entered judgment in favor of Fortune on all counts. On Fortune's Count I, the trial court awarded actual damages against Kelley. On Fortune's Count II, the court awarded actual damages against Kelley and Manchester and punitive damages against Kelley. On Fortune's Count III, the trial court awarded actual damages against Bank, Manchester, and Properties. On Fortune's Count IV, the court awarded actual damages against Bank and Manchester. The court also awarded interest and costs to Fortune. In addition, the trial court entered judgment in favor of Fortune on Bank's counterclaim and in favor of Manchester, Properties, and Kelley on Bank's cross-claim. Bank appeals from the judgment entered in favor of Fortune on Counts III and IV and entered against it on its counterclaim against Fortune and its cross-claim against Kelley, Manchester, and Properties.

In its first point, Bank contends that the trial court erred in finding that it breached its escrow agreement with respect to Fortune. Under that point, Bank first asserts that the court erred in failing to find Fortune in default for refusing to pay its share of the Heatherton deficit. Bank argues that Fortune was in default and that Fortune's default relieved it of the obligation to allot a portion of the Water Company's refund money to Fortune.

The trial court found that Fortune "paid its entire pro-rata and contractual share of contributions ... pursuant to the Contributors Agreement, the First Agreement, and the Adjustment Agreement." The evidence was that Fortune made the scheduled installment payments in accordance with the Agreement. Although Fortune declined to make its contribution to the Heatherton

deficit, the court found that Bank neither made written demand upon Fortune to pay its portion of the Heatherton default, as provided by Paragraph 3(a) of the Agreement, nor sent notice of any default to Fortune. Although Kelley made demand upon Fortune to contribute its pro-rata share of the deficit, none of the agreements at issue made Kelley Bank's authorized agent for the purpose of fulfilling Bank's duties as the escrow agent. There was substantial evidence to support the trial court's finding that Fortune was not in default under the terms of the Agreement. Because Fortune was not in default, Bank failed to comply with its duties as escrow agent when it didn't pay Fortune its pro-rata share in compliance with Paragraph 5 of the Agreement.

Bank's second claim of error under point one is that the trial court erred in finding that the Adjustment Agreement between Fortune and Manchester cured Fortune's default. Bank argues that because it was not a party to that agreement, the Adjustment Agreement did not operate to modify the terms of the original Agreement and Bank had no duty to pay Fortune who was in default under the terms of the original Agreement.

The trial court found that "the September 8, 1989 Agreement between Manchester and Fortune resolved any matters in dispute between Manchester and Fortune as to the Heatherton default." The Adjustment Agreement resolved the issue not only of the payment of the Heatherton deficit but also of the impact on Fortune's share if Kelley secured the rezoning of the additional 18 acres under option to Properties. The Adjustment Agreement also extended the time for Fortune's payment of the Heatherton deficit until June 1994. The only parties to the Adjustment Agreement were Fortune and Manchester. The Adjustment Agreement did not alter Bank's duties as escrow agent under the original Agreement. Paragraph 5 of the Agreement required Bank to pay any refund to Contributors, which included Fortune, on a pro-rata basis. Bank did not comply with that provision of the Agreement. Finally, Bank's assertion that the Adjustment Agreement cured Fortune's default is without mer-

it, in view of our finding above that Fortune was not in default under the Agreement. Bank's first point is denied.

In its second point, Bank contends that the trial court erred in concluding that Bank was not entitled to indemnification by Fortune and Manchester. Paragraph 4 of the Agreement provided for indemnification of Bank for any loss arising from Bank's "performance of its duties within the scope of its authority, except for acts of actual fraud, gross negligence or willful misconduct."

An escrow agent is charged with the performance of the express trust governed by the escrow agreement with duties to perform for each of the parties, which neither can forbid without the other's consent. *Southern Cross Lumber and Millwork Co. v. Becker*, 761 S.W.2d 269, 272 (Mo.App. 1988). When a person acts as the depository in escrow, the person is bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. *Id.* Moreover, a fiduciary relationship is created by the escrow agreement. *Id.* An escrow agent's failure to strictly follow the terms of the escrow agreement is a breach of its fiduciary duty. *Id.*

In the instant action, the trial court found the following:

> Once the Bank read the portion of paragraph 4 of the July 15, 1988 Contributors Agreement which provided indemnification, it closed its eyes to the remainder of the agreement and was content to have Kelley direct its actions, ignoring its responsibilities under the Contributors Agreement to the remaining partners. The Court finds that the Bank was grossly negligent in the performance of its responsibilities as escrow agent.

The court further concluded:

> Because the Bank breached the terms of the Contributors Agreement and its obligations as Escrow Agent pursuant to that Agreement, the Bank did not fulfill its duties and obligations or act in good faith. Consequently, the Bank is not entitled to indemnification from Fortune for any of its costs and expenses in connection with acting as Escrow Agent.

Paragraph 5 of the Agreement specified that Bank was to pay refunds received from the Water Company to the Contributors on a pro-rata basis. The Agreement did not provide that Bank's disbursement of the refund money was to be directed by Kelley. Bank had the duty to handle the refund money in accordance with the escrow agreement. Bank breached its duty when it abdicated control of the refund money to Kelley, who directed that the funds be distributed to business entities in which he was involved. Furthermore, Bank distributed part of the money to Properties, which was not a party to the escrow agreement and was not entitled to any portion of the refund under the Agreement. Bank was not engaged in "the performance of its duties" under Paragraph 4 of the Agreement when it made the distributions of the refund money; but rather it acted in contravention of the escrow agreement. Its conduct constituted a breach of the escrow agreement. Manchester and Fortune were not required to indemnify Bank for damages Bank sustained as a result of its own breach of the escrow agreement. The trial court did not err in finding that Bank was not entitled to indemnification from Fortune and Manchester. Bank's second point is denied.

In its third point, Bank contends that the trial court erred in determining Fortune's share of the refund money without an accounting. The trial court found that "Fortune's percentage interest, i.e., 21.48%, of the Refund from County Water, namely $266,979.41, after deducting $280.00 later paid back to Mark Twain Bank on behalf of County Water, equals $57,287.03."

Paragraph 5 of the Agreement provided that any refund "be divided among the Contributors according to their percentage interests...." The amount of the refund was readily ascertainable from the record before the court and Fortune's percentage was clearly set forth in the Agreement. The trial court followed the language of the Agreement in determining that Fortune was entitled to 21.48 percent of the refund. There was no need for an accounting. Bank's third point is denied.

**660**

In its fourth point, Bank contends that the trial court erred in finding in favor of Manchester and its individual partners on Bank's cross-claim. Bank maintains that because Kelley was the managing partner and agent of Manchester, Manchester and its partners were liable for his actions. The trial court not only found against Kelley individually but also found that Bank did not act in good faith when it did not abide by the terms of the escrow agreement.

■ Generally, a partnership is liable for the wrongful conduct of one of its partners only when that partner is acting within the ordinary course of the partnership's business or within the authority of his copartners. § 358.130, RSMo (1986). Here, the trial court did not find that Kelley was acting on behalf of Manchester and its partners when he took control of the disbursement of the refund money from the escrow account. Kelley's directing Bank to disburse $61,199.24 from the escrow account to Properties, which was a stranger to the escrow agreement, was not done within the scope of Manchester's authority or business. The disbursement of the refund money to Properties, which was another of Kelley's businesses, only inured to Kelley's benefit and not to Manchester's. In addition, there was no evidence that Manchester's other partners knew about, authorized, or ratified Kelley's actions in ordering the distribution of a portion of the refund money to Properties. The trial court did not err in finding that Bank was not entitled to indemnification from Manchester and its individual partners. Bank's fourth point is denied.

The judgment of the trial court is affirmed.

CRANE, P.J., and DOWD, J., concur.